# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

## No. 24-3487

_____

KRISTIN ANN TIX, now known as, KRISTIN ANN MCGOWAN,

*Plaintiff-Appellant*,

v.

ROBERT WILLIAM TIX,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA

_____

**BRIEF OF *AMICI CURIAE* TRIBES AND TRIBAL ORGANIZATIONS
CONCERNED WITH MAINTAINING NON-TERRITORIAL
JURISDICTION IN SUPPORT OF APPELLEE AND AFFIRMANCE**

_____

Kathryn Fort
Indian Law Clinic
MSU College of Law
648 N. Shaw Lane
East Lansing, MI
517-432-6992

Esther Labrado
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101
207-772-1941

*Attorneys for Amici Curiae Tribes and Tribal Organizations Concerned
with Maintaining Non-territorial Jurisdiction*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

_____

## No. 24-3487
_____

KRISTIN ANN TIX, now known as, KRISTIN ANN MCGOWAN,

*Plaintiff-Appellant,*

v.

ROBERT WILLIAM TIX,

*Defendant-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MINNESOTA

---

## BRIEF OF *AMICI CURIAE* TRIBES AND TRIBAL ORGANIZATIONS CONCERNED WITH MAINTAINING NON-TERRITORIAL JURISDICTION IN SUPPORT OF APPELLEE AND AFFIRMANCE

---

Kathryn Fort
Indian Law Clinic
MSU College of Law
648 N. Shaw Lane
East Lansing, MI
517-432-6992

Esther Labrado
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101
207-772-1941

*Attorneys for Amici Curiae Tribes and Tribal Organizations Concerned
with Maintaining Non-territorial Jurisdiction*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... ii

IDENTITY OF THE AMICI CURIAE AND STATEMENT OF INTEREST ........ 1

SUMMARY OF ARGUMENT ............................................................. 4

ARGUMENT ..................................................................................... 6

I.   Tribal Nations' Inherent Sovereign Authority Does Not Depend on the Existence of a Reservation or Indian Country. ................................. 6

   A. Due to Shifting Federal Policies, Tribal Land Bases Vary Significantly, and as such, Reservation Lands Cannot Be the Sole Basis for Tribal Jurisdiction. ................................................................................. 6

   B. All Federally Recognized Tribes, Regardless of Whether they Have a Reservation, Share the Same Attributes of Sovereignty. ................... 9

   C. The Lawful Exercise of Tribal Sovereign Authority is Not Tied to Territory. ................................................................................. 12

II.  Domestic Relations are at the Heart of Tribal Self-governance, and Tribal Nations Have Jurisdiction Regardless of the Location of the Child or Tribal Citizenship of the Parent. ......................................................... 17

   A. Tribes Have Inherent Authority Over Domestic Matters. ............... 17

   B. Tribal Authority is Most Clear Over Domestic Relations Disputes Involving Children who are Tribal Citizens or Eligible for Tribal Citizenship. ............. 19

CONCLUSION ............................................................................... 23

CERTIFICATE OF COMPLIANCE .................................................... 25

CERTIFICATE OF SERVICE .......................................................... 26

Appellate Case: 24-3487     Page: 3     Date Filed: 04/10/2025 Entry ID: 5505367

# TABLE OF AUTHORITIES

## Cases

*Bahe v. Platero*,
  11 Am. Tribal Law 104 (Nav. Sup. Ct. 2012) ..................................................... 24

*Cherokee Nation v. Bernhardt*,
  936 F.3d 1142 (10th Cir. 2019).......................................................................... 11

*Cherokee Nation v. Georgia*,
  30 U.S. 1 (1831) ................................................................................................. 13

*EEOC v. Fond du Lac Heavy Equip. & Const. Co.*,
  986 F.2d 246 (8th Cir. 1993)............................................................................... 17

*Father J v. Mother A*,
  2015 WL 5936866 (Mash. Pequot Tribal Ct. Aug. 21, 2015) ............................ 22

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ............................................................................................ 17

*John v. Baker*,
  982 P.2d 738 (Alaska 1999).........................................................................*Passim*

*Kaltag Tribal Council v. Jackson*,
  344 F.App'x 324 (9th Cir. 2009) ......................................................................... 16

*Kaltag Tribal Council v. Jackson*,
  2008 WL 9434481 (D. Alaska Feb. 22, 2008)..................................................... 21

*Kelsey v. Pope*,
  809 F.3d 849 (6th Cir. 2016)............................................................................... 15

*Koi Nation of N. California v. United States Dep't of Interior*,
  361 F. Supp. 3d 14 (D.D.C. 2019) ...................................................................... 10

*Koi Nation of N. California v. United States Dep't of the Interior,* No. CV 17-1718
  (BAH), 2019 WL 11555042 (D.D.C. July 15, 2019) .......................................... 11

Appellate Case: 24-3487     Page: 4     Date Filed: 04/10/2025 Entry ID: 5505367

*Koniag, Inc. v. Kanam,*
   2012 WL 2576210 (D. Alaska July 3, 2012) ....................................................... 14

*Little Traverse Bay Bands of Odawa Indians v. Whitmer,*
   998 F.3d 269 (6th Cir. 2021) ....................................................................................... 8

*Michigan v. Bay Mills,*
   572 U.S. 782 (2004) ..................................................................................................... 12

*Mississippi Band of Choctaw Indians v. Holyfield,*
   490 U.S. 30 (1989) ........................................................................................................ 22

*Montana v. United States,*
   450 U.S. 544 (1981) ................................................................................................ 18, 19

*Native Vill. of Venetie I.R.A. Council v. State of Alaska,*
   944 F.2d 548 (9th Cir. 1991) ............................................................................ Passim

*Sac & Fox Nation v. Norton,*
   585 F. Supp. 2d 1293 (W.D. Okla. 2006) ............................................................... 11

*Santa Clara Pueblo v. Martinez,*
   436 U.S. 49 (1978) ........................................................................................................ 17

*Sidney v. Zah,*
   718 F.2d 1453 (9th Cir.1983) ................................................................................... 15

*Simmonds v. Parks,*
   329 P.3d 995 (Alaska 2014) ...................................................................................... 23

*Spurr v. Spurr,* Case No. 17-287-APP (Nottaweseppi Huron Band of the
   Potawatomi S. Ct. 2018) ............................................................................................ 18

*State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska,*
   371 P.3d 255 (Alaska 2016) ................................................................. 18, 19, 20, 21

*State v. Native Vill. of Tanana,*
   249 P.3d 734 (Alaska 2011) .................................................................... 14, 16, 18

Appellate Case: 24-3487    Page: 5    Date Filed: 04/10/2025 Entry ID: 5505367

*United States v. Kagama,*
  118 U.S. 375 (1886) ................................................................... 17

*United States v. Mazurie,*
  419 U.S. 544 (1975) ................................................................... 15

*United States v. Wheeler,*
  435 U.S. 313 (1978) ....................................................... 13, 15, 18

*Walker v. Rushing,*
  898 F.2d 672 (8th Cir. 1990) ....................................................... 5

*Watso v. Lourey,*
  929 F.3d 1024 (8th Cir. 2019) ................................................... 23

*Wisconsin Potowatomies of Hannahville Indian Cmty. v. Houston,*
  393 F.Supp. 719 (W.D.Mich., 1973) ....................................... 19

*Worcester v. Georgia,*
  31 U.S. 515 (1832) ................................................................... 17

## Statutes and Session Laws

25 U.S.C. § 331 ............................................................................ 7

25 U.S.C. § 1901(3) ................................................................... 22

25 U.S.C. § 1903(8) ................................................................... 11

25 U.S.C. § 3601 ......................................................................... 11

25 U.S.C. § 5123(f) ............................................................. 10, 11

25 U.S.C. § 5131(a) ................................................................... 10

43 U.S.C. § 1601 ........................................................................... 9

43 U.S.C. § 1603 ........................................................................... 9

43 U.S.C. § 1618(a) ..................................................................... 9

Appellate Case: 24-3487    Page: 6    Date Filed: 04/10/2025 Entry ID: 5505367

Federally Recognized Indian Tribe List Act of 1994 (List Act), Pub. L. No. 103-454, § 103(6), 108 Stat. 4791 (1994) ................................................................. 10

Menominee Restoration Act, Pub. L. No. 93-197, 87 Stat. 770 (1973) .................. 8

Ponca Restoration Act, Pub. L. No. 101-484, 104 Stat 1167 (1990) ...................... 8

Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115-121, 132 Stat. 1185 (2018) ........................................................ 9

## Federal Regulations

58 Fed. Reg. 54, 366 (1993) ................................................................................ 12

## Rules

Fed. R. App. P. 29(a)(4)(e) .................................................................................. 1

## Other Authority

*Cohen's Handbook of Federal Indian Law* (Nell Jessup Newton & Kevin K. Washburn, eds., 2024)
 § 1.02 ........................................................................................... 13
 § 2.05 ............................................................................................. 6
 § 2.06 ............................................................................................. 6
 § 2.08 ............................................................................................. 7
 § 2.11 ............................................................................................. 8
 § 5.01 ........................................................................................... 13
 § 11.02 ......................................................................................... 23
 § 15.01 ................................................................................... 11, 22
 § 18.02 ........................................................................................... 9

David S. Case & David A. Voluck, *Alaska Natives and American Laws* (3d ed. 2012) .................................................................................................. 20

Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs Notice, 89 Fed. Reg. 238 (Dec. 11, 2024) .......... 6

Appellate Case: 24-3487 Page: 7 Date Filed: 04/10/2025 Entry ID: 5505367

Kekek Jason Stark, *Gwayak ateg Onaakonigewi Dibenjigewin: Decolonizing Jurisdiction in Anishinaabe Tribal Courts*, 103 Neb. L. Rev. 199 (2024) .......... 23

Little Traverse Bay Bands of Odawa Indians, *Land Ownership Map*, https://ltbbodawa-nsn.gov/wp-content/uploads/2024/09/2024_reservation-map-big-map_11x17.pdf ............................................................... 8

Ponca Tribe of Nebraska, *History,* https://www.poncatribe-ne.gov/culture/history/ .................................................... 7

William Wood, *The Trajectory of Indian Country in California: Rancherías, Villages, Pueblos, Missions, Ranchos, Reservations, Colonies, and Rancherias*, 44 Tulsa L. Rev. 317 (2008) ............................................................... 7

U.S. Dep't of Justice, *Attorney Generals Advisory Committee on American Indian and Alaska Native Children Exposed to Violence: Ending Violence so Children can Thrive* (Nov. 2014) ............................................................... 20

vi

## IDENTITY OF THE AMICI CURIAE AND STATEMENT OF INTEREST[1]

Amicus Association of Village Council Presidents ("AVCP") is the largest tribal consortium in the United States, serving 56 federally recognized member tribes in western Alaska. AVCP's 56 member Tribes are spread throughout the Yukon-Kuskokwim Delta (or "Y-K Delta"), an area roughly the size of New York, or over 55,000 square miles. AVCP's mission is Yup'ut calillgutekluk elluarrluta yuuluaqallerkamtenun, "working together with Tribes to enhance sovereignty, self-sufficiency, and our way of life." AVCP serves Member Tribes through social services across 20 major program areas including early childhood development through Head Start and other childcare programs, public assistance, public safety through the Village Public Safety Officer program, cash and emergency assistance to families in need, and workforce development, among other programs. AVCP has operated on behalf of the Federal Government through a self-governance compact for over 30 years. AVCP's largest program is the Tribal Child Welfare Program (TCW, formally called the ICWA program), which serves 41 compacted Member Tribes. TCW supports Tribes with children in state custody, prevention services for

---

[1] All parties have consented to the filing of this brief. *Amici curiae* file this brief in accordance with Federal Rule of Appellate Procedure 29(a)(2). No party's counsel authored this brief in whole or in part; no party's counsel contributed money to fund preparing or submitting this brief; and no person other than *Amici curiae* contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(e).

1

families that are struggling, and tribal child protection proceedings. AVCP also operates a Tribal Justice program that provides Tribal Court technical assistance and training for all Member Tribes. Currently, AVCP's Member Tribes operate over 35 operating Tribal Courts that hear cases including domestic violence protective orders, child custody, child protection, small claims, violations of tribal ordinances, and other domestic relations matters.

Amicus Central Council of the Tlingit & Haida Indian Tribes of Alaska is a federally recognized Tribe with more than 38,000 citizens. The aboriginal territory of Tlingit & Haida includes the lands and waters of Southeast Alaska, stretching from Yakutat to south of Ketchikan. Tlingit & Haida is the largest tribe in Alaska and one of two regional tribes in the country. While Tlingit & Haida is headquartered in Juneau, it provides services to citizens who live not only in Southeast Alaska, but throughout the state and the rest of the country. The Tribe has no reservation. Tlingit & Haida is committed to our peoples' "way of life", known as "Haa Kusti" among the Tlingit and "Tlagw íitl' xíinangaa Gíidang" among the Haida. Our mission is to, "Preserve our sovereignty, enhance our economic and cultural resources, and promote self-sufficiency and self-governance for our citizens."

Amicus Maniilaq Association ("Maniilaq") is a tribal consortium. Maniilaq is based in Kotzebue and is controlled by 12 federally recognized Tribes. Maniilaq provides culturally relevant health, social and Tribal governmental services to its

Appellate Case: 24-3487     Page: 10     Date Filed: 04/10/2025 Entry ID: 5505367

member Tribes, which are located in villages throughout Northwest Alaska in an area of approximately 38,000 square miles.

Amicus Tanana Chiefs Conference ("TCC"), organized as Dena' Nena' Henash, or "Our Land Speaks," is a sovereign tribal consortium with 42 tribal members across Interior Alaska, including 37 federally recognized tribes. TCC is an Alaska Native non-profit corporation that provides health and social services for the more than 13,000 Alaska Native people in the interior Alaska region. TCC was formed in 1962, but its history dates back over 100 years, when tribal chiefs from throughout the region banded together to protect their Native land rights.

TCC's region covers 235,000 square miles of Interior Alaska that comprises the Yukon Koyukuk, Yukon Tanana, Lower Yukon, Upper Kuskokwim, Yukon Flats, and Upper Tanana subregions. TCC is charged by its member tribes with advancing tribal self-determination and enhancing regional Native unity. Its mission is to provide a unified voice to advance sovereign tribal governments through the promotion of physical and mental wellness, education, socioeconomic development, and culture of the Interior Alaska Native people. TCC's strategic plan calls for strong tribes, educated and empowered tribal members, healthy people, safe and strong communities, economic sovereignty, and stewardship of its lands and resources. TCC works toward meeting the health and social service needs of tribal members and beneficiaries throughout the region. Its programs and services range from direct

Appellate Case: 24-3487    Page: 11    Date Filed: 04/10/2025 Entry ID: 5505367

healthcare services to tribal development services, natural resources management, public safety, community planning, and transportation.

The core question in this case is whether the Prairie Island Mdewakanton Dakota Indian Community ("Community") has subject matter jurisdiction over the dissolution of a marriage between a tribal member and a non-member who resided outside of the Community's reservation. Amici are Tribal Nations and Tribal consortia representing member tribes whose inherent sovereign authority to exercise this type of jurisdiction outside of any reservation has been repeatedly recognized and affirmed by the Alaska Supreme Court and the Ninth Circuit.

## SUMMARY OF ARGUMENT

The power to decide disputes involving citizens is integral to any government's authority, including tribal governments. Appellant argues against upholding Tribal jurisdiction because she never resided on the Community's reservation. Appellant's Br. at 22-26. But a tribe has subject matter jurisdiction over domestic matters involving non-members outside of a reservation because nearly 40% of federally recognized tribes do not have any reservation and yet share the same attributes of sovereignty as all other federally recognized tribes. Tribal authority is not dependent on the existence of a reservation and so exercise of that authority cannot be dependent on whether conduct or activities occurred on a reservation. Any determination by the Eighth Circuit on this question of jurisdiction

4

will necessarily affect tribes outside of the Circuit, including those with limited land bases. *See e.g., Native Vill. of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 560 (9th Cir. 1991) (citing *Walker v. Rushing*, 898 F.2d 672, 675 (8th Cir. 1990) (discussing the import of Public Law 280 on tribal jurisdiction and sovereign power). Moreover, a decision requiring the existence of a reservation for the exercise of tribal jurisdiction would create a circuit split and cast doubt on the inherent tribal authority of hundreds of tribes with very small or no reservations – authority which has already been recognized by the Ninth Circuit and the Alaska Supreme Court.

Questions of tribal jurisdiction require an analysis of not just the location of the individual parties, but of the very nature of tribal sovereignty and the extent to which it has been altered, divested, or diminished. Here, the Community clearly had jurisdiction to adjudicate the dissolution between Mr. Tix and his former wife because it falls within the Community's retained inherent authority to adjudicate cases involving domestic relations, even when a non-member is involved, and especially where there are tribal children involved.

## ARGUMENT

## I. Tribal Nations' Inherent Sovereign Authority Does Not Depend on the Existence of a Reservation or Indian Country.

### A. Due to Shifting Federal Policies, Tribal Land Bases Vary Significantly, and as such, Reservation Lands Cannot Be the Sole Basis for Tribal Jurisdiction.

The diversity of Indian Country cannot be understated. Today, there are 574 federally recognized tribes, with their own languages, government structures, cultures and traditions, and relevant here, land bases.[2] Due to the arrival of Europeans and subsequent birth and expansion of the United States, the imposition of Western concepts of property ownership, and numerous shifts in federal Indian policy, tribal land bases today do not have uniform characteristics. The exercise of tribal jurisdiction cannot be tied to a particular kind of tribal land base, especially not a reservation, because there is not one kind of tribal land base and not all tribes have reservations.

Beginning in the 1820s, many tribes were removed from their traditional homelands and, by the 1850s, were restricted to designated areas of land known as Indian reservations. *See Cohen's Handbook of Federal Indian Law* § 2.05[1], at 45, § 2.06[1], at 58 (Nell Jessup Newton & Kevin K. Washburn, eds., 2024) [hereinafter *Cohen's Handbook*]. The size and location of these reservations varied immensely.

---

[2] Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs Notice, 89 Fed. Reg. 238 (Dec. 11, 2024).

6

In California, more than a hundred tribes negotiated treaties to reserve land for their communities, which the United States later refused to ratify and ultimately sealed from the public record. *See* William Wood, *The Trajectory of Indian Country in California: Rancherías, Villages, Pueblos, Missions, Ranchos, Reservations, Colonies, and Rancherias*, 44 Tulsa L. Rev. 317, 339-41 (2008). Under the unratified treaties, tribes in California should have had rights to approximately one-seventh of the state, *id.* at 339, rather than the approximately 450,000 acres, or less than one percent, they have today. *Id.* at 363.

In the 1880s, federal policy shifted from separation to assimilation, and reservations were divided into parcels set aside for individual Indians and their families, known as "Indian allotments." *See* General Allotment Act of 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. § 331) (repealed 2000). During this time, most tribes lost most of their tribal land base, and some tribes lost all of it. Estimates show tribes that had 138 million acres in 1887 were left with 48 million in 1934. *See Cohen's Handbook,* § 2.08[3][b] at 87.

In the 1930s, federal policy swung back the other way, with the goals of protecting tribes' land bases and enabling self-government, but reversed course again shortly thereafter. *See id.* § 2.09[2] at 106, § 2.10[1] at 111-12. In the 1940s and 1950s, Congress passed legislation terminating the government-government

7

relationship with 109 tribes who possessed more than 1.3 million acres of land. *See id.* § 2.10[3] at 116.

Many of the affected tribes were later restored to federal recognition, *see e.g.*, Menominee Restoration Act, Pub. L. No. 93-197, 87 Stat. 770 (1973); Ponca Restoration Act, Pub. L. No. 101-484, 104 Stat 1167 (1990); *see also Cohen's Handbook*, § 2.11[6] at 135, but have struggled to restore their land bases. By way of example, after a history of removal and return, the Ponca Tribe of Nebraska had 26,000 acres restored to them. Ponca Tribe of Nebraska, *History*, https://www.poncatribe-ne.gov/culture/history (last visited Apr. 8, 2025). However, in 1966, Congress pulled federal recognition from the Ponca and their reservation lands were sold off. *Id.* Despite re-recognition in 1990, the Ponca Tribe has been unable to restore its Indian Country land base. *See id.* Other tribes throughout the country have similar histories, have also been denied relief from federal courts, and as a result have similarly small land bases. *See, e.g., Little Traverse Bay Bands of Odawa Indians v. Whitmer*, 998 F.3d 269, 287 (6th Cir. 2021); *see also* Little Traverse Bay Bands of Odawa Indians, *Land Ownership Map*, https://ltbbodawa-nsn.gov/wp-content/uploads/2024/09/2024_reservation-map-big-map_11x17.pdf (last visited Apr. 8, 2025).

The final major federal policy shift affecting tribal lands came in 1971, when Congress enacted the Alaska Native Claims Settlement Act ("ANCSA") to settle

land claims by Alaska Natives. *See generally* 43 U.S.C. § 1601. Unlike all previous native land claims settlements, ANCSA did not create a "reservation system." 43 U.S.C. § 1601(b). In fact, ANCSA eliminated all but one of the Indian reservations in Alaska, the Annette Island Reserve of the Metlakatla Indian Community. 43 U.S.C. §§ 1603, 1618(a).

In recent decades, many Tribal Nations have purchased land outright which today can be held in fee simple, in restricted fee status, or in trust by the United States for the benefit of the tribe. *See Cohen's Handbook*, § 18.02[1][a][v] at 1135 . None of these types of land ownership necessarily involve a reservation. More recently, Congress has re-established a government-government relationship with tribes located in Virginia, without establishing additional reservations. Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115-121, 132 Stat. 1185 (2018).

In short, well over half the federally recognized tribes in the United States do not have the stereotypical large reservation system and a majority of those do not have reservations at all. The exercise of tribal jurisdiction therefore cannot be limited to only reservation lands.

### B. All Federally Recognized Tribes, Regardless of Whether they Have a Reservation, Share the Same Attributes of Sovereignty.

Despite the fact that some federally recognized tribes have reservations and some do not, Congress has made it clear that there is no question that all federally

recognized tribes have the same sovereign status. Where only one of the 229 federally recognized Alaska Native villages has a reservation, the equal treatment of Alaska Native villages compared to those in the Lower 48 provides the clearest example of this principle. However, tribes without reservations outside of Alaska, and those with small reservations like the Community, have not been treated differently than other federally recognized tribes either.

First, the Secretary of the Interior is required to keep a list of all federally recognized tribes "which the Secretary recognizes to be eligible for the special programs and services provided by the United States to Indians because of their status as Indians." 25 U.S.C. § 5131(a); *see also* Federally Recognized Indian Tribe List Act of 1994 (List Act), Pub. L. No. 103-454, § 103(6), 108 Stat. 4791, 4792 (1994). This list includes all 574 federally recognized tribes with no regard for the type or size of tribal lands a tribe may have.

Second, Congress has expressly prohibited federal departments and agencies from distinguishing between federally recognized tribes.

> Departments or agencies of the United States shall not promulgate any regulation or make any decision or determination . . . with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.

25 U.S.C. § 5123(f). Courts have repeatedly upheld these equal protection principles. *See Koi Nation of N. California v. United States Dep't of Interior*, 361 F. Supp. 3d

10

14, 54 (D.D.C. 2019), amended sub nom. *Koi Nation of N. California v. United States Dep't of the Interior*, No. CV 17-1718 (BAH), 2019 WL 11555042 (D.D.C. July 15, 2019) ("[Section] 5123(f) prohibits disparate treatment between similarly situated recognized tribes."); *see also Cherokee Nation v. Bernhardt*, 936 F.3d 1142, 1161 n.21 (10th Cir. 2019) (noting that the United Keetoowah Band of Cherokee Indians shares the privileges and immunities available to other tribes with respect to its right to assert its jurisdiction); *Sac & Fox Nation v. Norton*, 585 F. Supp. 2d 1293, 1299 n.10 (W.D. Okla. 2006) (refusing to create two classes of tribes).

With respect to Alaska specifically, where no reservation other than the Annette Island Reserve exists, Congress has treated Alaska Native villages the same as those tribes with reservations. For example, Congress passed the Tribal Justice Act, 25 U.S.C. § 3601 *et seq.*, providing financial support to federally recognized tribes, including Alaska Native villages, for tribal court activities and drawing no distinction between tribes with or without reservations. *See John v. Baker*, 982 P.2d 738, 754 (Alaska 1999) [hereinafter "John I"]. Similarly, in enacting legislation aimed in part at protecting the decision-making authority of Tribes regarding Indian children, Congress drew no distinction between Alaska Native villages and those tribes with reservations. *See id.* at 753; 25 U.S.C. § 1903(8); *Cohen's Handbook* § 15.01[1] at 950. As the Alaska Supreme Court has said, "inclusion of Alaska Native villages on the federally recognized tribes list makes clear that Alaska Native

11

villages 'have the right . . . to exercise the same inherent and delegated authorities available to other tribes.'" *John I*, 982 P.2d at 753 (quoting 58 Fed. Reg. 54, 366 (1993)).

Thus, regardless of the type of land base a tribe has, and specifically, whether the tribe has a reservation at all, all federally recognized tribes share the same attributes of inherent sovereignty. *See e.g., Native Vill. of Venetie*, 944 F.2d at 557–59 ("villages are to be afforded the same rights and responsibilities as are sovereign bands of native Americans in the continental United States"); *John I*, 982 P.2d at 753 ("If tribes that do not occupy Indian country have no inherent powers of self-governance, the language in the Tribe List Act that expressly reserves to these tribes 'the right ... to exercise the same inherent and delegated authorities available to other tribes' would be virtually meaningless.").

## C. The Lawful Exercise of Tribal Sovereign Authority is Not Tied to Territory.

The nature of tribal sovereignty is critical to understanding the parameters of tribal jurisdiction and why it is not tied to a tribe's reservation, as appellant suggests. "Indian tribes are 'domestic dependent nations' that exercise 'inherent sovereign authority.'" *Michigan v. Bay Mills*, 572 U.S. 782, 788 (2004). Tribes are "domestic" because they are physically located within the United States, "dependent" because they are subject to federal power, and "nations" because they continue to exercise inherent sovereign powers that predate the United States. *See Cohen's Handbook*, §

12

1.02 at 2; *Cherokee Nation v. Georgia*, 30 U.S. 1, 17-18 (1831). Tribes' inherent sovereign authority is limited only by their status as domestic dependent nations or where Congress has affirmatively divested them of their authority. *See United States v. Wheeler*, 435 U.S. 313, 323 (1978); *see also Native Vill. of Venetie,* 944 F.2d at 558.

Tribal jurisdiction over a divorce involving a non-member or non-Indian and a tribal citizen does not implicate this first category of federally imposed limitations on tribal authority. Federal case law has articulated that tribes' "domestic" status necessarily imposes certain limitations on the exercise of *external* powers that are "inconsistent with the territorial sovereignty of the United States." *See Cohen's Handbook* § 5.01[1][a] at 251; *see also Wheeler*, 435 U.S. at 323 ("Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised."). First, this limitation on tribal authority focuses on an internal-external powers dichotomy, making the existence or size of tribal land irrelevant to the question of whether a tribe's inherent authority has been limited. Second, the tribal authority exercised by the Community here is categorically *internal* and therefore not subject to this limitation. The Community's adjudication of the Tix-McGowan divorce is not inconsistent with the territorial sovereignty of the United States and has not been limited by the Community's "domestic" status.

The second limitation on tribal authority is also not implicated here because Congress has not restrained tribal authority over domestic affairs to only on-reservation activities or conduct. As described *supra*, at I., A.–B., this is plainly seen in the case of Alaska Native villages[3] because although Congress eliminated nearly all reservations in Alaska through ANCSA, it did not divest Alaska Native villages of their sovereign powers. *See John I*, 982 P.2d at 753. (Congress did not intend for ANCSA to divest tribes of their powers to adjudicate domestic disputes"); *State v. Native Vill. of Tanana*, 249 P.3d 734, 743 (Alaska 2011) (same); *see also Native Vill. of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 558 n.12 (9th Cir. 1991).

In fact, tribal authority over domestic affairs and other internal matters is not limited only to a tribe's land base because tribal authority stems from two intertwined sources, tribal citizenship and land, and tribal power to adjudicate internal domestic matters derives "from a source of sovereignty independent of the land they occupy." *John I*, 982 P.2d at 754; *Koniag, Inc. v. Kanam*, No. 3:12-CV-00077-SLG, 2012 WL 2576210, at *5 (D. Alaska July 3, 2012) (recognizing two

---

[3] Because of the complicated land status for the 229 federally recognized tribes in Alaska, the Alaska Supreme Court and Ninth Circuit have had special occasions to examine the question of exercise of tribal authority outside the boundaries of a reservation - non-territorial based sovereignty. *See John I*, 982 P.2d at 754 (federal courts have not had occasion to tease apart the ideas of land-based sovereignty and membership sovereignty because traditional reservation-based structures exist in most states).

14

distinct bases for tribal jurisdiction – territorial and internal domestic matters, and noting that Alaska Native villages "may possess an inherent sovereign jurisdiction to adjudicate" internal domestic matters). *See also Wheeler*, 435 U.S. at 323 ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory") (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)). *See e.g., Native Vill. of Venetie*, 944 F.2d at 558 n.12 (9th Cir.1991) ("tribal sovereignty is not coterminous with Indian country . . . Rather, tribal sovereignty is manifested primarily over the tribe's members."); *see also Sidney v. Zah*, 718 F.2d 1453, 1456 (9th Cir.1983) ("Membership is therefore another aspect of tribal sovereignty which exists separate and apart from the territorial jurisdiction of the tribe.").

At least one circuit has recognized the unnatural fit of imputing geographical boundaries on tribal sovereignty. *See Kelsey v. Pope*, 809 F.3d 849, 857 (6th Cir. 2016) ("[c]ertainly we cannot read into the laws and customs of the Indian tribes a principle of territoriality of jurisdiction with which they were totally unfamiliar") (citing Solicitor's Opinion, April 27, 1939, 1 Op. Sol. on Indian Affairs 891, 896 (U.S.D.I.1979) at 9-10).

Thus, in determining the extent of tribal court jurisdiction, courts "look[] to the character of the power that the tribe seeks to exercise, not merely the location of events." *John I*, 982 P.2d at 752; *see Native Vill. of Tanana*, 249 P.3d at 743; *see*

15

also *Kaltag Tribal Council v. Jackson*, 344 F.App'x 324, 325 (9th Cir. 2009) (unpublished) ("Reservation status is not a requirement of jurisdiction because '[a] Tribe's authority over its reservation or Indian country is incidental to its authority over its members.'") (quoting *Venetie*, 944 F.2d at 559 n.12). The fundamental question "is not whether the tribe is located in Indian country, but rather whether the tribe needs jurisdiction over a given context to secure tribal self-governance." *John I*, 982 P.2d at 756.

A determination by this Court that restricts tribal jurisdiction over domestic issues to only reservation lands would necessarily eliminate this important authority from tribes with limited or no land bases. Federally recognized tribes without a reservation must be able to exercise their inherent sovereign authority, on par with tribes with reservations. This is especially true in the area of domestic relations.

16

II.     **Domestic Relations are at the Heart of Tribal Self-governance, and Tribal Nations Have Jurisdiction Regardless of the Location of the Child or Tribal Citizenship of the Parent.**

A.     **Tribes Have Inherent Authority Over Domestic Matters.**

Courts have been unequivocal that Tribal Nations have retained, inherent authority over matters affecting self-government. Tribal Nations remain a "separate people, with the power of regulating their internal and social relations." *United States v. Kagama*, 118 U.S. 375, 381-82 (1886); *EEOC v. Fond du Lac Heavy Equip. & Const. Co.,* 986 F.2d 246, 249 (8th Cir. 1993); *see also Worcester v. Georgia*, 31 U.S. 515, 519 (1832) (noting Indian tribes are "distinct, independent political communities, retaining their original natural rights" in matters of local self-government). Tribal Nations have the power to make their own substantive law in internal matters, including membership, inheritance rules and domestic relations. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–56 (1978) (citations omitted). Indeed, the Constitution "reflect[s] an understanding that Tribes enjoy a power to rule themselves that no other governmental body—state or federal—may usurp." *Haaland v. Brackeen*, 599 U.S. 255, 310 (2023) (Gorsuch J., concurring).

At issue here is a dissolution of a marriage, the quintessential "domestic relation," which is clearly within tribes' retained inherent sovereignty. "Internal functions involving tribal membership and domestic affairs," *John I*, 982 P.2d at 751, are within the "core set of sovereign powers that remain intact even though

17

Indian nations are dependent under federal law." *Id.*; *see Native Vill. of Tanana*, 249 P.3d at 750; *see also Spurr v. Spurr*, Case No. 17-287-APP (Nottaweseppi Huron Band of the Potawatomi S. Ct. 2018), *available at* https://nhbp-nsn.gov/wp-content/uploads/2018/07/Spurr-v.-Spurr-17-287-APP_Opinion-of-the-Supreme-Court-for-the-NHBP.pdf (finding jurisdiction for the issuance of a family protection order over a non-Indian who lived off-reservation) (last visited Apr. 8, 2025).

In fact, although the district court concluded that the Community had authority to preside over this case under the first *Montana* exception, *Montana* itself makes clear that this dispute is within the Community's retained inherent authority without any need to reach its exceptions. *See Montana v. United States*, 450 U.S. 544, 564 (1981) ("the Indian tribes retain their inherent power to determine tribal membership, to *regulate domestic relations among members*, and to prescribe rules of inheritance for members") (emphasis added) (citing *Wheeler*, 435 U.S. at 322 n.18); *see also State v. Cent. Council of Tlingit & Haida Indian Tribes of Alaska*, 371 P.3d 255, 271–72 (Alaska 2016) (noting "*Montana* does not apply" to inquiry of whether tribe has jurisdiction to adjudicate child support matters involving a non-Indian parent and where family did not reside in Indian country).

Thus, the Community had jurisdiction to adjudicate the dissolution of Mr. Tix and Ms. McGowan's marriage because the exercise of tribal authority is not outside of what is needed to control the Community's internal relations. *See Montana*, 450

18

U.S. at 564 ("exercise of tribal power *beyond* what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes") (emphasis added).

### B. Tribal Authority is Most Clear Over Domestic Relations Disputes Involving Children who are Tribal Citizens or Eligible for Tribal Citizenship.

The existence of tribal jurisdiction over a dissolution of marriage involving children who are, or are eligible to become, tribal citizens is even more clear because hearing disputes involving tribal youth are part of a tribe's inherent authority to control internal relations. *See Cent. Council*, 371 P.3d at 263; *John I*, 982 P.2d at 752 ("[tribe's] adjudication of child custody disputes over member children is necessary 'to protect tribal self-government or to control internal relations,' [and] its tribal courts require no express congressional delegation of the right to determine custody of tribal children"). "If tribal sovereignty is to have any meaning at all at this juncture of history, it must necessarily include the right . . . to provide for the care and upbringing of its young, a sine qua non to the preservation of its identity." *Wisconsin Potowatomies of Hannahville Indian Cmty. v. Houston*, 393 F.Supp. 719, 730 (W.D. Mich., 1973).

Indeed, a tribe's continued existence is dependent on its future generations, placing issues involving its youth at the very center of self-governance. *See Cent. Council*, 371 P.3d at 265 (describing a tribe's interest in its citizen children as

completely intrinsic to the tribe's future, sovereignty, and basic existence). Only by having full authority to regulate matters such as the one in front of this Court can tribes fully protect their own communities and ensure the health and safety of their families.[4]

Whether they have a reservation or not, Alaska Native villages regularly exercise jurisdiction over their families as part of their inherent sovereignty. *See* David S. Case & David A. Voluck, *Alaska Natives and American Laws* 438 (3d ed. 2012) ("Over one hundred tribal courts and councils are actively resolving disputes in Native communities in Alaska."). These families often include both a non-member or non-Indian parent. This exercise of jurisdiction is also a practical necessity because many tribal communities, including those in Alaska, are extraordinarily rural and tribal courts are therefore the *only* local venue to resolve disputes.

Given the large number of federally recognized tribes without reservations in Alaska, the Alaska Supreme Court has had ample opportunity to analyze the jurisdictional questions this Court now faces and has repeatedly affirmed tribal jurisdiction over domestic disputes involving tribal children, even where one parent

---

[4] *See* U.S. Dep't of Justice, *Attorney General's Advisory Committee on American Indian/Alaska Native Children Exposed to Violence: Ending Violence so Children can Thrive*, 43-44 (Nov. 2014), *available at* https://www.justice.gov/d9/defendingchildhood/pages/attachments/2015/03/23/ending_violence_so_children_can_thrive.pdf.

is a non-member or non-Indian. Less than a decade ago, the Alaska Supreme Court affirmed tribes' inherent, non-territorial jurisdiction over child support cases involving children who are, or are eligible to become, tribal citizens, including those with a non-member parent. *Cent. Council*, 371 P.3d at 257. The court explained that tribal jurisdiction was not an exercise of "general jurisdiction over nonmember parents," but rather an exercise of "specific jurisdiction to adjudicate child support matters arising out of a parent's obligations to his or her tribal child, whose citizenship is the basis of inherent tribal sovereignty." *Id.* at 271. "[T]ribes' inherent authority over child support stems from their power over family law matters concerning the welfare of Indian children—an area of law that is integral to tribal self-governance." *Id.* at 269.

Other courts have also found a child's citizenship to be the deciding factor on whether a tribe can exercise subject matter jurisdiction over a non-Indian in cases involving children. *See Kaltag Tribal Council v. Jackson*, No. 3:06-CV-211 TMB, 2008 WL 9434481, at *6 (D. Alaska Feb. 22, 2008), aff'd, 344 F. App'x 324 (9th Cir. 2009) ("A tribe's inherent sovereignty to adjudicate internal domestic custody matters depends on the membership or eligibility for membership of the child.") (quoting *John I*, 982 P.2d at 759-60); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 52 (1989) (recognizing that tribes have an interest in their member children which is distinct from but on a parity with that of the parents);

Appellate Case: 24-3487     Page: 29     Date Filed: 04/10/2025 Entry ID: 5505367

*Father J v. Mother A*, No. MPTC-CV-FR-2014-207, 2015 WL 5936866, at \*4, \*6 (Mash. Pequot Tribal Ct. Aug. 21, 2015) (finding jurisdiction over a divorce involving a tribal member father and child, and citing to Navajo Supreme Court cases).

Additionally, courts have looked to the Indian Child Welfare Act ("ICWA") as evidence of congressional intent concerning tribal jurisdiction over decisions involving children, noting it as "the most appropriate test for deciding when a tribal court has subject matter jurisdiction over a particular custody dispute." *John I*, 982 P.2d at 764. In ICWA, Congress noted that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," Indian Child Welfare Act, 25 U.S.C. § 1901(3), and "the States . . . have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." *Id.* at § 1901(5). *See also John I*, 982 P.2d at 754 ("Although the child custody dispute at the center of this case falls outside ICWA's scope, Congress's purpose in enacting ICWA reveals its intent that Alaska Native villages retain their power to adjudicate child custody disputes."); *Cohens Handbook*, § 15.01[1] at 950.

Where questions of tribal jurisdiction arise under ICWA, courts have made clear that the tribe has jurisdiction even when one parent is non-Indian and the family does not live on a tribe's reservation. *See Simmonds v. Parks*, 329 P.3d 995, 1019

22

(Alaska 2014) ("'The Act accommodates Indian children with mixed parentage from intertribal marriages,' and tribal jurisdiction and intervention rights depend solely on the membership status of the child.") (citing *Cohen's Handbook*, § 11.02[3], at 838). The Eighth Circuit has also found tribal jurisdiction over tribal children despite confusion over their domicile and residence. *See Watso v. Lourey*, 929 F.3d 1024, 1027 (8th Cir. 2019).

Exercising tribal jurisdiction over domestic relations involving children who are, or are eligible to become, citizens is at the heart of what tribal courts do. *See* Kekek Jason Stark, *Gwayak ateg Onaakonigewi Dibenjigewin: Decolonizing Jurisdiction in Anishinaabe Tribal Courts*, 103 Neb. L. Rev. 199, 224-25 (2024) (describing the Anishinaabe clan system and family relations). Whether the tribe's land base is thousands of acres of reservation land, a hundred acres of land held in fee, or does not exist at all, its authority over internal domestic relations remains the same.

This is because a divorce or dissolution of a marriage involves questions that are at the heart of tribal jurisdiction. Specifically, who will have custody of the Indian children? How will tribal resources be allocated between the parents? How will the custodial parent care for the material needs of the child? How will the children and parents maintain access to needed tribal services? These are all questions a tribal court is best positioned to answer under tribal law. The Navajo

23

Nation frames this as the "inherent sovereign right to watch over the upbringing of tribal children as a matter of the health, safety and welfare of the Nation as a whole." *Bahe v. Platero*, 11 Am. Tribal Law 104, 107 (Nav. Sup. Ct. 2012).

Based on its own law, federal policy, and federal case law, there is no question that the Prairie Island Indian Community had inherent jurisdiction to adjudicate the dissolution proceeding at issue before the Court, despite the residence of the parents. To hold otherwise would fundamentally harm the jurisdiction of federally recognized tribes without reservations across the country.

Appellate Case: 24-3487     Page: 32     Date Filed: 04/10/2025 Entry ID: 5505367

## **CONCLUSION**

The District Court's decision should be affirmed.

Respectfully submitted this 8th day of April, 2025.

<table>
<tr><td></td><td>/s/Esther Labrado</td></tr>
<tr><td>Kathryn Fort</td><td>Esther Labrado</td></tr>
<tr><td>Indian Law Clinic</td><td>Drummond Woodsum</td></tr>
<tr><td>MSU College of Law</td><td>84 Marginal Way, Suite 600</td></tr>
<tr><td>648 N. Shaw Lane</td><td>Portland, ME 04101</td></tr>
<tr><td>East Lansing, MI</td><td>207-772-1941</td></tr>
</table>

*Attorneys for Amici Curiae Tribes and Tribal Organizations Concerned with Maintaining Non-territorial Jurisdiction*

Appellate Case: 24-3487    Page: 33    Date Filed: 04/10/2025 Entry ID: 5505367

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,472 words, excluding those parts of this brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface of 14 points or more using Microsoft Word 365. This brief has been scanned for viruses pursuant to Eighth Circuit Local Rule 28A(h)(2) and is virus-free.

*/s/Esther Labrado*
Esther Labrado
*Attorney for Amici Curiae Tribes and Tribal Organizations Concerned with Maintaining Non-territorial Jurisdiction*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on April 8, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Esther Labrado
Esther Labrado
*Attorney for Amici Curiae Tribes and Tribal Organizations Concerned with Maintaining Non-territorial Jurisdiction*

Appellate Case: 24-3487    Page: 35    Date Filed: 04/10/2025 Entry ID: 5505367