No. 24-3487

_____

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

**KRISTIN ANN TIX,**
**now known as Kristin Ann McGowan,**
Plaintiff-Appellant,

**v.**

**ROBERT WILLIAM TIX,**
Defendant-Appellee.

_____

**Appeal from the United States District Court**
**for the District of Minnesota**

_____

**BRIEF OF LEGAL SCHOLARS MAGGIE BLACKHAWK,**
**ALEXANDRA FAY, DAN LEWERENZ, AND JEAN O'BRIEN**
**AS AMICI CURIAE IN SUPPORT OF DEFENDANT-APPELLEE**

_____

Steven J. Alagna                    WASHINGTON UNIVERSITY SCHOOL OF LAW
*Counsel of Record*                 Appellate Clinic
                                    One Brookings Drive, MSC 1120-250-102
Kyle Lorey                          St. Louis, MO 63130
Kaitlyn Salyer                      (314) 935-7238
Olivia L. Guidry                    salagna@wustl.edu
*Student Advocates*

                    *Counsel for Amici Curiae*

April 9, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................ii

INTEREST OF AMICI CURIAE........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT .................................................................................6

I.    The United States has long recognized the centrality of "domestic affairs" to tribal sovereignty. ........................................................6

II.   The United States has long recognized tribal jurisdiction over all family law matters, including marriage and divorce, even those involving non-Indians. ................................................................8

    A.  The United States has historically recognized broad tribal civil jurisdiction over tribal communities.........................................8

    B.  The United States recognized tribal civil jurisdiction over domestic affairs, including those involving non-Indians, during the Removal Era......................................................................12

    C.  The United States continued to recognize broad tribal jurisdiction over domestic affairs, including over non-Indians, following the Civil War...........................................................17

    D.  Broad tribal jurisdiction over domestic affairs, including non-Indians, was recognized as well established by the twentieth century. ......................................................................24

    E.  Modern tribal courts continue to exercise jurisdiction over domestic affairs between Indians and non-Indians................26

III.  The tribal court properly exercised jurisdiction over this family-law case. ..........................................................................................29

CONCLUSION ..............................................................................32

CERTIFICATE OF COMPLIANCE....................................................34

CERTIFICATE OF SERVICE..............................................................34

i

# TABLE OF AUTHORITIES

**Cases**

*Banks v. Galbraith*, 51 S.W. 105 (Mo. 1899) ........................................... 23

*Barrett v. Barrett*, 878 P.2d 1051 (Okla. 1994) ....................................... 29

*Byzewski v. Byzewski*, 429 N.W.2d 394, 400 (N.D. 1988) ....................... 29

*Chartier v. Chartier*, 2013 MI Odawa Tribal LEXIS (2013) ................. 27

*Cherokee Nation v. Journeycake*, 155 U.S. 196 (1894) ........................... 13

*Crabtree v. Madden*, 54 F. 426 (8th Cir. 1893) ...................................... 12

*Cyr v. Walker*, 116 P. 931 (Okla. 1911) .................................................. 23

*Dallas v. Curley*, 1996 Hopi App. LEXIS (1996) .................................... 27

*Denezpi v. United States*, 596 U.S. 591 (2022) ....................................... 18

*Earl v. Godley*, 44 N.W. 254 (Minn. 1890) ............................................. 23

*First Nat. Bank v. Sharpe*, 33 S.W. 676 (Tex. Civ. App. 1896) ............. 23

*In re Custody of R.W.O.E.*, 2001 ML 5088 (Crow Ct. App. 2001) ........... 27

*In re D.L.M.*, 2005 Hoopa Valley App. LEXIS (2005) ............................ 27

*Jacobson v. Satiacum*, 1993 Puyallup Trib. LEXIS (1993) ................... 27

*Johnson v. Johnson's Adm'r*, 30 Mo. 72 (1860) ...................................... 17

*Johnson v. M'Intosh*, 21 U.S. 543 (1823) ................................................ 11

*Kelly v. Kelly*, 759 N.W.2d 721 (N.D. 2009) ........................................... 29

*La Riviere v. La Riviere*, 10 S.W. 840 (Mo. 1889) .................................. 24

*Langdeau v. Langdeau*, 751 N.W.2d 722 (S.D. 2008) ............................ 29

*Leon v. Numkena*, 689 P.2d 566 (Ariz. Ct. App. 1984) .......................... 28

*McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164 (1973) ............... 2

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) ............................................... 3

*Miodowski v. Miodowski*, 2006 WL 3454797 (D. Neb. Nov. 29, 2006) ... 28

*Montana v. United States*, 450 U.S. 544 (1981) ................................... 3, 4

Appellate Case: 24-3487    Page: 3    Date Filed: 04/11/2025 Entry ID: 5505516

*Morgan v. McGhee*, 24 Tenn. 13 (1844) ................................................ 17

*Morton v. Mancari*, 417 U.S. 535 (1974) ............................................... 2

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845 (1985) ................................................................................................. 9

*Nofire v. United States*, 164 U.S. 657 (1897) ........................... 5, 8, 22, 23

*Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978) ................ 3, 4

*Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316 (2008) ........................................................................................... 3, 29

*Red Bird v. United States* (*Cherokee Intermarriage Cases*), 203 U.S. 76 (1906) ..................................................................................... 13, 14, 32

*Rosser v. Rosser,* 2013 WL 372474 (W.D. Okla. Jan. 30, 2013) ............. 28

*Sanders v. Robinson*, 864 F.2d 630 (9th Cir. 1988) ............................... 27

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) ..................... 3, 5, 29

*Senter v. Choctaw Nation*, No. 234 (Indian Territory Ct. 1898), *in* 1898 Dep't Interior Ann. Rep. 467 ................................................... 7, 20, 23

*Solem v. Bartlett*, 465 U.S. 463 (1984) ................................................... 3

*Strate v. A-1 Contractors*, 520 U.S. 438 (1997) ..................................... 12

*Tex. Life Ins. Co. v. Raper*, 2015 WL 5009805 (W.D. Okla. Aug. 24, 2015) ................................................................. 28

*Turpen v. Muckleshoot Tribal Ct.*, 2023 WL 4492250 (W.D. Wash. July 12, 2023) ................................................................................................ 28

*Turpen v. Turpen*, 2022 Muckleshoot App. LEXIS (2022) ..................... 27

*Tuten's Lessee v. Byrd*, 31 Tenn. 108 (1851) ......................................... 17

*United States v. Cooley*, 593 U.S. 345 (2021) ................................. 3, 4, 30

*United States v. Quiver*, 241 U.S. 602 (1916) ......................................... 6

*United States v. Rogers*, 45 U.S. 567 (1846) ........................................... 2

*United States v. Wheeler*, 435 U.S. 313 (1978) ....................................... 4

*Wall v. Williamson*, 8 Ala. 48 (1845) ...................................................... 7

Appellate Case: 24-3487      Page: 4      Date Filed: 04/11/2025 Entry ID: 5505516

*Yazzie v. Yazzie*, 1985 Navajo Sup. LEXIS (1985) .................................. 27


**Statutes**

25 U.S.C. § 1901(3) ................................................................................ 8


**Other Authorities**

38 C.J. *Marriage* § 4 (1925) .................................................................. 25

14 R.C.L. *Indians* § 17 (1916) ............................................................ 25

18 R.C.L. *Marriage* § 9 (1917) ............................................................ 25

19 C.J. *Divorce* § 824 (1920) ................................................................ 8

27A C.J.S. *Divorce* § 5 (2005) ............................................................ 26

27C C.J.S. *Divorce* § 1219 (2005) ...................................................... 26

31 C.J. *Indians* § 25 (1923) ................................................................ 25

42 C.J.S. *Indians* § 135 (2024) ............................................................ 26

An Act Regulating Intermarriages with White Men (1855), *in Laws of the Cherokee Nation Passed During the Years 1839–1867* (St. Louis, Missouri Democrat Print 1868) ..................................................... 15, 32

An Act showing what is necessary for white men to marry in this Nation, *in The Constitution and Laws of the Choctaw Nation* (Park Hill, Mission Press 1847) ............................................................... 14, 15

An Act to Legalize Intermarriage with White Men (1839), *in John Ross Papers*, https://collections.gilcrease.org/object/4026842-1?position=6&list=bCxxs4eukAnkqIMtOwOQe6Q3X1aLMk-yPlRtR6zUOS0 ................................................................................ 14

An Act to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States Court in the Indian Territory, and for other purposes, ch. 182, § 38, 26 Stat. 81, 98 (1890) ............................................................................... 19, 20

iv

*Annual Report of the Commissioner of the Office of Indian Affairs to the Secretary of Interior* (1890) .................................................. 10

Authorization and Certification Concerning the Marriage of L.A. Bivin and Catherine Timberlake (1872), *in John Drew Manuscript Collection*, https://collections.gilcrease.org/object/40261939 ............ 14

Bethany Ruth Berger, *After Pocahontas: Indian Women and the Law, 1830 to 1934*, 21 Am. Indian L. Rev. 1 (1997) ................................ 5, 15

Certificate by Judge John S. Vann of Marriage of G.W. Williams and Nancy Rattlingourd (1869), *in John Drew Manuscript Collection*, https://collections.gilcrease.org/object/40261925 ............................... 14

Certified Copy of An Act of Cherokee National Council to Dissolve Marriage between T.W. Lindsay and Susan R. Lindsay (1886), *in John W. Swain Manuscript Collection*, https://collections.gilcrease.org/object/5126815 ............................... 14

Cohen, *Handbook of Federal Indian Law* (1945) ............................... 6, 7

Cohen, *Handbook of Federal Indian Law* (1982) ................................... 11

Cohen, *Handbook of Federal Indian Law* (2024) ......................... 2, 3, 10

Gary D. Sandefur & Trudy McKinnell, *American Indian Intermarriage*, 15 Soc. Sci. Rsch. 347 (1986) ............................................................... 5

H.R. Rep. No. 23-474 (1834) .................................................................. 10

*Indian Territory Affairs: Before the H. Comm. on Indian Affs.*, 58th Cong. 4 (1904) (statement of Tams Bixby, Chairman of the Commission to the Five Civilized Tribes) .................................... 21, 22

Joseph R. Long, *Indians*, *in* 16 *The American and English Encyclopedia of Law* 212 (2d ed. 1900) ...................................................................... 25

*Jurisdiction of the Courts of the Choctaw Nation*, 7 Op. Att'y Gen. 174, 1855 WL 2297 (1855) ......................................................................... 16

*Laws of the Cherokee Nation Passed During the Years 1839–1867* (St. Louis, Missouri Democrat Print 1868) ............................................... 15

Lewis Meriam, *The Problem of Indian Administration* (1928) ............... 7

*Noah Bredell*, 53 Interior Dec. 78 (1930) .................................... 22, 24, 25

Appellate Case: 24-3487     Page: 6     Date Filed: 04/11/2025     Entry ID: 5505516

Osage Nation Const. art. IX, § 1, *reprinted in Treaties and Laws of the Osage Nation, as passed to November 26, 1890*, at 51 (Cedar Vale 1895) ................................................................................................. 18

Records of the Court of Indian Offenses, 1913–1922, Record Group 75, National Archives at Riverside (unprocessed series) ......................... 19

Records of the Court of Indian Offenses (Yakama), Box 252, National Archives at Seattle (Vol. 1 1903–1904) ............................................. 19

S. Rep. No. 41-268 (1870) ......................................................................... 4

Standing Rock Court of Indian Offenses 1890–1943, Box 359, Folder 1 (1890) ....................................................................................................... 18

Treaty with the Choctaw and Chickasaw arts. 26, 38, Apr. 28, 1866, 14 Stat. 769 ................................................................................................. 13

Treaty of Dancing Rabbit Creek art. 4, Sept. 27, 1830, 7 Stat. 333 ....... 11

Treaty with Chickasaws art. 4, Jan. 10, 1786, 7 Stat. 24 ...................... 10

Treaty with the Cherokee art. 5, Nov. 28, 1785, 7 Stat. 18 ..................... 9

Treaty with the Choctaws art. 4, Jan. 3, 1786, 7 Stat. 21 ...................... 10

Treaty with the Delawares art. 4, Sept. 17, 1778, 7 Stat. 13 ................. 9

W.T. Nelson, *Marriage, in* 19 *The American and English Encyclopedia of Law* 1156 (2d ed. 1901) ................................................................... 25

Appellate Case: 24-3487     Page: 7     Date Filed: 04/11/2025 Entry ID: 5505516

## INTEREST OF AMICI CURIAE[1]

Amici Curiae, listed below, are professors and scholars who teach and research federal Indian law and its history. They have an interest in the accurate recitation of the history of relations between Native American tribal governments and the United States and the cohesive and correct development of Indian-law jurisprudence. This interest and expertise bear on the question whether tribal governments have authority to adjudicate divorces involving one of their members and where the custody of tribal-member children and distribution of tribal property are at issue. Amici submit this brief to aid this Court in understanding the history of tribal jurisdiction over domestic affairs, including the marriage and divorce proceedings for Indians and non-Indians alike.

**Maggie Blackhawk** (Fond du Lac Band of Lake Superior Ojibwe)
Professor of Law
New York University School of Law

---

[1] No party's counsel authored this brief in whole or in part and no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief. No person other than Amici or their counsel made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

1

**Alexandra Fay**
Assistant Professor of Law
University of Tulsa College of Law

**Dan Lewerenz** (Iowa Tribe of Kansas and Nebraska)
Assistant Professor of Law and Director of the Indian Law &
Tribal Law Certificate Program
University of North Dakota School of Law.

**Jean M. O'Brien** (White Earth Ojibwe Nation)
Regents Professor of History
University of Minnesota

## INTRODUCTION AND SUMMARY OF ARGUMENT

The inherent power of tribal governments to govern their communities predates the Founding of the United States and has been recognized in federal law. *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 172 (1973). Courts have historically deferred to Congress and the Executive in defining the relationship between the U.S. and tribal governments, including setting limits on what forms of tribal sovereignty and jurisdiction the U.S. would recognize. Cohen, *Handbook of Federal Indian Law* § 6.03[3][b] (2024). Judicial deference was foundational in federal Indian law in the nineteenth century, *United States v. Rogers*, 45 U.S. 567, 572 (1846), and courts continue to uphold Congress's role in defining Indian affairs today, even when Congress regulates fundamental rights, *Morton v. Mancari*, 417 U.S. 535 (1974), and with

2

respect to matters that involve the property and political power of non-Indians. *McGirt v. Oklahoma*, 591 U.S. 894 (2020); *Solem v. Bartlett*, 465 U.S. 463, 470 (1984).

However, fifty years ago, the Supreme Court began unilaterally limiting tribal sovereignty through the "implicit divestiture" or "dormant plenary power" doctrine, Cohen, *supra*, § 603[3][b], notably in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), and *Montana v. United States*, 450 U.S. 544 (1981). Despite these judicially imposed limitations, the Court affirmed that tribal governments "remain 'a separate people, with the power of regulating their internal and social relations.'" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (citation omitted). Thus, they retain the power to "legislate and to tax," "determine tribal membership," and "regulate domestic relations among members." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 327 (2008). Although the Supreme Court limited the jurisdiction of tribal governments over non-Indians in certain circumstances, it emphasized that this judicially crafted limitation "was not an absolute rule" and was subject to exceptions. *United States v. Cooley*, 593 U.S. 345, 350 (2021).

Appellate Case: 24-3487     Page: 10     Date Filed: 04/11/2025 Entry ID: 5505516

The Court has consistently turned to the historical exercise of tribal governance to inform its determination as to whether tribal power exists. *Oliphant*, 435 U.S. 191; *Montana*, 450 U.S. 544. Similarly, the Court has looked to history, as well as state- and federal-court recognition of that history, to determine whether tribal governments possess authority that "is ancillary to [an] authority that we have already recognized." *Cooley*, 593 U.S. at 352.

This brief surveys the history of tribal governments exercising jurisdiction over "domestic relations," particularly marriage and divorce. This survey reveals that the United States, including the Supreme Court, has long recognized tribal-government power over marriage and divorce. Congress, and the courts, saw "domestic affairs" like marriage and divorce as particularly central to tribal governments' "right of self government." *United States v. Wheeler*, 435 U.S. 313, 325 n.23 (1978) (quoting S. Rep. No. 41-268, at 10 (1870)).

This historical survey further reveals that the power to regulate domestic affairs necessarily included the power to determine the rights and privileges that tribal governments would afford to non-Indians who were in domestic relation to Indians. Areas of "domestic affairs" were so

4

central to self-government and tribal sovereignty, in fact, that marriage and divorce often served to determine the boundaries of tribal communities. Marriage between Indians and non-Indians was common. *See, e.g.*, Gary D. Sandefur & Trudy McKinnell, *American Indian Intermarriage*, 15 Soc. Sci. Rsch. 347, 350 n.2 (1986); Bethany Ruth Berger, *After Pocahontas: Indian Women and the Law, 1830 to 1934*, 21 Am. Indian L. Rev. 1, 24 & n.119 (1997). Marriage to a tribal member was a primary way that non-Indians accessed the rights and privileges offered by tribal governments, defining the boundaries of who formed part of the community. *See, e.g.*, *Nofire v. United States*, 164 U.S. 657 (1897); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) (The "right to define [tribal government] membership . . . has long been recognized as central to [a tribe's] existence as an independent political community.").

This case concerns the dissolution of a marriage involving tribal citizens and the subsequent distribution of tribal property and privileges. Since the Founding, U.S. law recognized the power of tribal governments to regulate affairs internal to their communities, a power that necessarily involved deciding whom to include in that community

5

and what rights and privileges to afford them. Appellant, who enjoyed regular distributions of tribal wealth as her sole source of income, as well as tribal health and dental benefits, seeks to retain those privileges post-divorce. The tribal court, applying tribal law, held that Appellant would no longer benefit from tribal rights and privileges following dissolution. These are matters at the heart of tribal sovereignty and the exercise of tribal jurisdiction over them is ancillary to tribal power over "domestic affairs." Thus, the tribal court rightly exercised jurisdiction in this case.

## ARGUMENT

### I.  The United States has long recognized the centrality of "domestic affairs" to tribal sovereignty.

The United States has long recognized the power of tribal governments over the regulation of family law. "At an early period it became the settled policy of Congress to permit the personal and domestic relations of the Indians with each other to be regulated . . . according to their tribal customs and laws." *United States v. Quiver*, 241 U.S. 602, 603–05 (1916). State and federal courts broadly recognized "Indian custom marriage and divorce." Cohen, *Handbook of Federal Indian Law* 137 & n.113 (1945) (collecting cases).

6

Tribal power over marriage and divorce was seen as so "complete and exclusive" that state law did not apply to "the domestic relations of Indians living in tribal relationship, even though the Indians concerned are the citizens of the state." *Id.* at 137. "The courts of the several states . . . have almost uniformly upheld [Indian custom marriages and divorces] on the theory that the national government has recognized the autonomy of the Indians . . . and thus removed them from the realm of state law in this respect." Lewis Meriam, *The Problem of Indian Administration* 760 (1928) (collecting cases). Even Southern state governments like Alabama, hostile to the existence of tribal governments in their borders, recognized the exclusivity of tribal power over marriage and divorce following removal. *Wall v. Williamson*, 8 Ala. 48, 51–52 (1845) (recognizing a Choctaw marriage as valid because tribal law had not been "changed by the conqueror" by "positive enactment").

Domestic affairs were seen as particularly central to sovereignty. Domestic affairs involved issues that were deeply local, impacting families, children, domicile, inheritance, and the most intimate aspects of community life. *See, e.g.*, *Senter v. Choctaw Nation*, No. 234 (Indian Territory Ct. 1898), *in* 1898 Dep't Interior Ann. Rep. 467, 470 (identifying

7

the "right to regulate marriage" as among "the most simple and common, as well as the most necessary, attributes of sovereignty."); *see also* 25 U.S.C. § 1901(3) (concluding, in the Indian Child Welfare Act, that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children"). Family-law matters, like marriage and divorce, shaped who belonged and what privileges they were afforded within Native communities. Thus, marriage drew the very contours of tribal governments. Marriage was an avenue for non-tribal citizens, even non-Indians, to access the rights and privileges of tribal membership—a status sometimes known as "citizen[ship] by adoption." *Nofire*, 164 U.S. at 662. Accordingly, the Court recognized that these non-Indians would be subject to tribal law and jurisdiction. *Id.*

## II. The United States has long recognized tribal jurisdiction over all family law matters, including marriage and divorce, even those involving non-Indians.

### A. The United States has historically recognized broad tribal civil jurisdiction over tribal communities.

Because marriage blurred the boundaries of who were Indians and non-Indians in the early republic, it is challenging to distinguish within the archives between the exercise of tribal sovereignty over Indians from non-Indians during this early period. *See, e.g.*, 19 C.J. *Divorce* § 824

8

(1920) ("Some of the cases [regarding dissolution of an Indian marriage] make no distinction between cases where the husband is a full-blooded Indian, and where he is a half-breed or even a white man." (citations omitted)). However, the historical record is replete with accounts of tribal governments exercising broad jurisdiction over their entire community. "At one time [tribal governments] exercised virtually unlimited power over their own members as well as those permitted to join their communities." *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851 (1985).

As early as 1778, the very first treaty between the nascent United States and the Delawares recognized the authority of the tribe to govern not only themselves, but also non-Indians, and established a process whereby the United States and Delaware Nation would collectively determine the due process owed non-Indians accused of crimes under tribal law. Treaty with the Delawares art. 4, Sept. 17, 1778, 7 Stat. 13, 14. Other early treaties went even further, expressly recognizing tribes' authority to punish "as they please[d]" any "citizen of the United States" who violated tribal law. Treaty with the Cherokee art. 5, Nov. 28, 1785,

7 Stat. 18, 19.[2]  The United States ultimately relied on tribal law enforcement over Indians and non-Indians alike well into the post-treaty era.  *See Annual Report of the Commissioner of the Office of Indian Affairs to the Secretary of Interior* 92 (1890).

During the Removal Era, the United States began to constrict its broad recognition of tribal power over their communities.  Yet, Congress continued to recognize tribal civil jurisdiction over certain non-Indians, particularly those who had voluntarily brought themselves into relations with the tribe through residence or family ties.  *See generally* Cohen, *supra*, § 2.05[3].  Notably, for instance, in the House Report on the 1834 Western Territory Act, Congress explained:

> The right of self-government is secured to each tribe, with jurisdiction over all persons and property within its limits, subject to certain exceptions, founded on principles somewhat analogous to the international laws among civilized nations. . . . [A]s to those persons not required to reside in the Indian country, who voluntarily go there to reside, they must be considered as voluntarily submitting themselves to the laws of the tribes.

H.R. Rep. No. 23-474, at 18 (1834).

---

[2] *See also, e.g.*, Treaty with Chickasaws art. 4, Jan. 10, 1786, 7 Stat. 24, 25; Treaty with the Choctaws art. 4, Jan. 3, 1786, 7 Stat. 21, 22 (similar).

The judiciary, too, consistently recognized tribal authority over non-Indians who joined tribal communities. *Johnson v. M'Intosh* expressly confirmed tribes' jurisdiction over non-Indians who "incorporate" themselves within tribal governments, concluding that any person acquiring land from Native people would be "under their protection, and subject to their laws," and if the tribe were to make a decision about that property, "we know of no tribunal which can revise and set aside the proceeding." 21 U.S. 543, 593 (1823). This recognition of civil authority contrasted sharply with the withdrawal from tribes of criminal jurisdiction over non-Indians, suggesting that the continued recognition of the former was intentional. *See, e.g.*, Treaty of Dancing Rabbit Creek art. 4, Sept. 27, 1830, 7 Stat. 333, 333–34 (denying Choctaw courts criminal jurisdiction over non-Indians, but leaving intact civil authority); *see also* Cohen, *Handbook of Federal Indian Law* 254 (1982) ("Congress's failure to regulate civil jurisdiction in Indian country suggests both that there was no jurisdictional vacuum to fill and that Congress was less concerned with tribal civil, non-penal jurisdiction over non-Indians . . . .").

Appellate Case: 24-3487     Page: 18     Date Filed: 04/11/2025 Entry ID: 5505516

Even at the nadir of tribal power, during the so-called Reservation Era, tribes exercised civil jurisdiction over non-Indians expansively and with the sanction of the United States. *See, e.g.*, *Crabtree v. Madden*, 54 F. 426, 429 (8th Cir. 1893) (recognizing that where the Creek Tribe had "lawful authority to impose [a permit tax], it had equal power to prescribe the remedies and designate the officers to collect it"); *see also Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997) ("[W]here tribes possess authority to regulate the activities of nonmembers, civil jurisdiction over disputes arising out of such activities presumptively lies in the tribal courts." (cleaned up)).

### B. The United States recognized tribal civil jurisdiction over domestic affairs, including those involving non-Indians, during the Removal Era.

Tribal governments exercised their broad authority over domestic affairs to institute regimes governing intermarriage between Indians and non-Indians during the Removal Era. These regulations focused on formalizing the process by which a person joined the community of the Native nation through marriage. Importantly, the laws also began to set limitations on the rights and privileges extended to non-Indians by marriage and ensured that non-Indians receiving tribal benefits by

intermarriage were subject to "the control and dominion of the [tribe's] laws." *Red Bird v. United States* (*Cherokee Intermarriage Cases*), 203 U.S. 76, 82 (1906). Regulation of domestic affairs involving non-Indians was central to tribal sovereignty because of a growing concern over non-Indians strategically accessing "lands and vested wealth" of tribal government through marriage. *Id.* at 82–83 ("[T]here were [non-Indian] adventurers desiring to share in the wealth of the Nation.").

Strategic access to the wealth of tribal governments had been facilitated under federal law, which presumed equal rights of distribution of Native-nation wealth to all community members, *id.* at 82 (citing *Cherokee Nation v. Journeycake*, 155 U.S. 196 (1894)), and promised treaty rights and protections for all members of tribal communities, even those who joined through intermarriage. *See, e.g.*, Treaty with the Choctaw and Chickasaw arts. 26, 38, Apr. 28, 1866, 14 Stat. 769. Thus, the Supreme Court recognized that it had long been necessary—to prevent the strategic taking of tribal-government resources by non-Indians intermarrying into the tribe—to support tribal-law regulation over domestic affairs involving non-Indians. *Cherokee Intermarriage Cases*, 203 U.S. at 82.

13

The Cherokee Nation, for example, enacted a law in 1839 regulating intermarriage between non-Indian men and Cherokee women and authorizing tribal-court judges to perform the marriage ceremony.[3] Failure to comply with the requirements for marriage stripped non-Indians "of the rights and privileges of a citizen of this Nation." *Id.* Pursuant to the 1839 authorization, the Cherokee tribal court issued marriage licenses[4] and granted divorce decrees between non-Indian men and Cherokee women.[5]

Similarly, the Choctaw Nation enacted a law prescribing the requirements for non-Indian men wishing to marry a tribal citizen. An Act showing what is necessary for white men to marry in this Nation, *in*

---

[3] An Act to Legalize Intermarriage with White Men (1839), *in John Ross Papers*, https://collections.gilcrease.org/object/4026842-1?position=6&list=bCxxs4eukAnkqIMtOwOQe6Q3X1aLMk-yPlRtR6zUOS0.

[4] *See, e.g.*, Certificate by Judge John S. Vann of Marriage of G.W. Williams and Nancy Rattlingourd (1869), *in John Drew Manuscript Collection*, https://collections.gilcrease.org/object/40261925; *see also* Authorization and Certification Concerning the Marriage of L.A. Bivin and Catherine Timberlake (1872), https://collections.gilcrease.org/object/40261939.

[5] *See, e.g.*, Certified Copy of Act of Cherokee National Council to Dissolve Marriage between T.W. Lindsay and Susan R. Lindsay (1886), *in John W. Swain Manuscript Collection*, https://collections.gilcrease.org/object/5126815.

Appellate Case: 24-3487     Page: 21     Date Filed: 04/11/2025 Entry ID: 5505516

*The Constitution and Laws of the Choctaw Nation* 33–34 (Park Hill, Mission Press 1847). The Act mandated that, to obtain the "privilege[s] of citizenship" through marriage, a non-Indian man would have to obtain a license from a "judge or district clerk." *Id.* § 6. It also established the terms of how tribal rights and privileges could be used, mandating that no non-Indian "shall have the disposal of [his spouse's] property without her consent" and that he would be "deprived" of the rights and privileges of citizenship if he left his spouse without cause. *Id.* The Cherokee Nation passed a similar act three years later. *Laws of the Cherokee Nation Passed During the Years 1839–1867*, at 104 (St. Louis, Missouri Democrat Print 1868); *see also* Berger, *supra*, at 29 & n.142. Later tribal regulations were even more intricate and included special regulations for non-Indians who had intermarried into the tribe; penalties included stripping of tribal privileges and banishment. *See, e.g.*, An Act Regulating Intermarriages with White Men (1855), *in Laws of the Cherokee Nation Passed During the Years 1839–1867*, *supra*, at 104–05 (requiring that white men who wished to marry a Cherokee woman swear an oath to "submit to the constitution and laws of the Cherokee nation" and enacting rules for "any white citizen of the Cherokee Nation by

15

marriage," the violation of which would result in revocation of the privileges of citizenship and removal as an intruder).

The federal government recognized these exercises of tribal jurisdiction over non-Indians as legitimate, even as the United States began to constrict its recognition of tribal power over non-Indians overall. For example, Attorney General Caleb Cushing concluded, in his 1855 analysis of Choctaw laws regulating marriage and citizenship and the 1830 Treaty of Dancing Rabbit Creek that while a non-Indian may not be subject to the Choctaw Nation's criminal jurisdiction, the tribe retained civil jurisdiction over his property dispute with his Choctaw wife's children. *Jurisdiction of the Courts of the Choctaw Nation*, 7 Op. Att'y Gen. 174, 184–85, 1855 WL 2297 (1855). As to Choctaw jurisdiction over non-Indian citizens by marriage, Cushing concluded that "when a [non-Indian] freely seeks, and seeking is permitted to enjoy, the privileges of a Chicasaw [sic] or Choctaw, and then presumes to set up those very privileges as the pretext of lawless independence of any judicial authority whatever, he forfeits all claim to special consideration on the part of the Executive of the United States." *Id.* at 185.

16

State governments also recognized tribes' authority over marriages between Indians and non-Indians during this period. For instance, in view of the general rule that "[a] marriage good by the laws of the country where consummated is held good in all others," *Morgan v. McGhee*, 24 Tenn. 13, 15 (1844), a Tennessee court held valid a marriage "according to the forms and ceremonies of the tribe" between a non-Indian man and a Cherokee woman. *Id.* at 14; *Tuten's Lessee v. Byrd*, 31 Tenn. 108 (1851) (implicitly recognizing the validity of marriage between non-Indian man and Cherokee woman). In Missouri, another state court held that a marriage between an Indian and a non-Indian was "unquestionably good according to the laws and customs of the Indians" as "a marriage, valid according to the law or custom of the place where it is contracted, is valid everywhere." *Johnson v. Johnson's Adm'r*, 30 Mo. 72, 80, 88 (1860).

### C. The United States continued to recognize broad tribal jurisdiction over domestic affairs, including over non-Indians, following the Civil War.

Following the Civil War, in addition to regulations of the marriage ceremony and terms of dissolution, some tribal governments also began to require that non-Indians secure permits before they could marry tribal members. The Osage Nation, for example, required any U.S. citizen

17

seeking to marry an Osage woman to "apply[] for a license" from the National Council, pay the clerk of the Council "the sum of twenty dollars" and swear "an oath to support the Constitution and abide by the laws of the Osage Nation." Osage Nation Const. art. IX, § 1 (asserting that "jurisdiction of [Osage] civil laws should be exercised over all persons whatever"), *reprinted in Treaties and Laws of the Osage Nation, as passed to November 26, 1890*, at 51, 90 (Cedar Vale 1895).

Tribal courts during this era, known as Courts of Indian Offenses,[6] exercised jurisdiction over both marriage and divorce actions. The Standing Rock Court of Indian Offenses, for example, granted divorce decrees as early as 1890.[7] Similarly, the Yakama Court of Indian Offenses has records of marriage licenses and divorce decrees dating from

---

[6] These courts apply the laws of multiple sovereigns, federal and tribal. *Denezpi v. United States*, 596 U.S. 591 (2022).

[7] *See* Standing Rock Court of Indian Offenses 1890–1943, Box 359, Folder 1 (1890) (documenting divorces on June 9th, September 30th, and October 28th, 1890) (on file with Amici).

Appellate Case: 24-3487    Page: 25    Date Filed: 04/11/2025 Entry ID: 5505516

1903,[8] and the Pima Court of Indian Offenses handled disputes over divorce, division of marital property, and child support as early as 1913.[9]

Congress recognized by statute the validity of tribal laws governing intermarriage between Indians and non-Indians, including within the Oklahoma Organic Act, which established the Oklahoma Territory. *See* An Act to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States Court in the Indian Territory, and for other purposes, ch. 182, § 38, 26 Stat. 81, 98 (1890). The Act authorized the U.S. territorial courts to issue marriage licenses, but limited their power so as to not "interfere with the operation of the laws governing marriage enacted by any of the civilized tribes." *Id.* The Organic Act also authorized the federal territorial courts to solemnize marriages or "unite" non-Indians and "a member of any of the civilized nations," but only when the "marriage shall have first been arranged according to the laws of the nation of which said Indian person is a

---

[8] *See* Records of the Court of Indian Offenses (Yakama), Box 252, National Archives at Seattle (Vol. 1 1903–1904) (documenting divorces throughout 1903–04) (on file with Amici).

[9] *See* Records of the Court of Indian Offenses, 1913–1922, Record Group 75, National Archives at Riverside (unprocessed series) (documenting divorces in 1913) (on file with Amici).

Appellate Case: 24-3487    Page: 26    Date Filed: 04/11/2025 Entry ID: 5505516

member." *Id.* The federal territorial court would later describe the Oklahoma Organic Act as "a direct recognition of the validity of the Choctaw [marriage] statute by the United States through its laws enacted by Congress" and "statutory recognition of the sovereignty of these civilized nations to . . . control their own marriage and naturalization laws." *Senter v. Choctaw Nation*, No. 234 (Indian Territory Ct. 1898), *in* 1898 Dep't Interior Ann. Rep. 467, 470–71. The federal territorial court characterized the power to regulate domestic affairs, including "the right to regulate marriage and prescribe all reasonable rules relating to the naturalization of white men in this country" as among "the most simple and common, as well as the most necessary, attributes of sovereignty." *Id.* at 470. Power over family law and naturalization were "so essential to the virtue and welfare of the commonwealth that they ought not to be construed away from this Indian tribe except upon the most positive and certain terms of the law." *Id.*

The Executive, in administering federal Indian law, recognized and relied on tribal law governing marriage and divorce in determining the distribution of tribal wealth and resources. For example, to fulfill its mandate of breaking up and distributing reservation land, the Dawes

Appellate Case: 24-3487    Page: 27    Date Filed: 04/11/2025 Entry ID: 5505516

Commission was "required by law to determine the rights of citizenship in all of the five tribes," which necessitated distinguishing between non-Indians who had obtained the rights and privileges of citizenship in tribal governments by marriage and non-Indians who had not properly obtained access to these rights and privileges. *Indian Territory Affairs: Before the H. Comm. on Indian Affs.*, 58th Cong. 4 (1904) (statement of Tams Bixby, Chairman of the Commission to the Five Civilized Tribes) ("Several of the tribes permit intermarriage and citizenship in the tribes if the marriage occurs according to Indian laws."); *see also id.* at 14 (discussing "the intermarried [non-Indian] people" as making up a portion of Tribal membership). The Commission's mandate required the distribution of tribal lands to tribal community members. Deciding who constituted a tribal community member necessitated the Commission's recognition of tribal marriage-law authority (and thus the authority of tribal governments) over non-Indians. The Secretary of the Interior, too, affirmed this tribal authority repeatedly in its administration of appeals from decisions by the Commission. *See id.* at 23–25 (noting 538 approvals and 236 approvals by the Secretary of applications for enrollment on the basis of citizenship in the Choctaw and Chickasaw Nations respectively

Appellate Case: 24-3487     Page: 28     Date Filed: 04/11/2025 Entry ID: 5505516

by intermarriage); *id.* at 31 (noting the 1,149 "[i]ntermarried [non-Indians] . . . on final Cherokee roll approved by the Department"). Moreover, in addition to its support of the Commission, the Department of Interior recognized tribal marriage law as a matter of course. *See Noah Bredell*, 53 Interior Dec. 78, 83–84 (1930) (establishing that the position of the Department was to find tribal customary divorce "a valid divorce dissolving the prior marriage relation, *no matter what may have been the method or the manner by which the marriage was assumed.*" (citation omitted)).

Ultimately, the Supreme Court followed Congress and the Executive in recognizing tribal-government jurisdiction over domestic affairs involving non-Indians. In 1897, the Supreme Court answered the question whether a tribal court had jurisdiction over a murder committed by Cherokee Nation citizens of another man who had gained the privileges of citizenship in the Cherokee Nation by marriage. *Nofire*, 164 U.S. 657. Under the General Crimes Act, the tribal government would retain jurisdiction over the crime if it involved only Indian perpetrators and victims. *Id.* at 658. In *Nofire*, the Court held that, because the victim had obtained citizenship under tribal law through marriage—and

22

because the perpetrators were Indian—the tribal court retained jurisdiction over the crime. *Id.* at 661–62; *see also Senter*, *supra*, at 471 (describing *Nofire* as "inferentially" resolving the question of tribal jurisdiction over such marriages "in favor of the validity of these Indian marriage statutes").

State courts, too, consistently recognized tribal jurisdiction over marriage and divorce between Indians and non-Indians following the Civil War. *See Cyr v. Walker*, 116 P. 931, 934 (Okla. 1911) ("The courts of the American Union have, from an early time, recognized the validity of . . . such marriages between a member of an Indian tribe and a white person, not a member of such tribe. . . . And the same effect is given to the dissolution of the marriages under the customs of the tribe as is given to the marriage relation itself." (cleaned up)); *First Nat. Bank v. Sharpe*, 33 S.W. 676 (Tex. Civ. App. 1896) (affirming as valid a marriage under the customs of the Creek Nation between an Indian and a non-Indian); *accord Earl v. Godley*, 44 N.W. 254, 255 (Minn. 1890); *Banks v. Galbraith*, 51 S.W. 105, 106 (Mo. 1899) ("The cases decided by the courts sustaining marriages between white men and Indian women in the Indian country simply conform to an almost universal principle of international law that

23

a marriage celebrated in other states and countries, if valid by the laws of such countries, are valid in this state . . . ."); *La Riviere v. La Riviere*, 10 S.W. 840 (Mo. 1889) (finding that a marriage between an Indian and a non-Indian according to tribal custom is valid even if it does not occur in the territory of the Tribe).

### D. Broad tribal jurisdiction over domestic affairs, including non-Indians, was recognized as well established by the twentieth century.

In the early twentieth century, Congress and the Executive recognized the establishment of tribal jurisdiction over domestic affairs as long settled. In 1930, the Opinion of the Solicitor of the Interior declared that the Department's posture "long has been not only to recognize Indian custom divorce of an Indian custom marriage, but of a ceremonial marriage as well." *Noah Bredell*, 53 Interior Dec. at 82. The opinion concluded that

> as Congress, the courts, the department, and in many instances the States, have all recognized the validity of Indian custom marriage and divorce, it necessarily follows that they must be recognized and treated as being of equal validity with ceremonial marriage and legal divorce. Hence the policy and practice heretofore in this regard are fully justified and should be followed until the enactment by Congress of legislation changing the situation.

*Id.* at 95–96.[10]

Treatises contemporaneous to the Solicitor's 1930 Opinion described the same general principle—that tribes retain their jurisdiction over marriage and divorce when a non-Indian marries an Indian.[11] That general principle carried into modern treatises as well.

---

[10] The Opinion also notes that neither the extension of United States citizenship to Indians nor the allotment of lands in severalty terminated tribal jurisdiction over marriage and divorce. *Id. at* 87; *see also id. at* 93 ("It is for Congress alone to say when [tribal customary marriage and divorce] shall cease. . . . ).

[11] *See* Joseph R. Long, *Indians*, *in* 16 *The American and English Encyclopedia of Law* 212, 214 n.1 (2d ed. 1900) ("Where Indians maintain their tribal relations, marriages or divorces among them, or between them and white persons, according to their tribal forms and customs, are valid although not in accordance with the laws of the state."); *accord* W.T. Nelson, *Marriage*, *in* 19 *The American and English Encyclopedia of Law* 1156, 1216 (2d ed. 1901); 14 R.C.L. *Indians* § 17 (1916) ("The right of self-government vested in the Indian Tribes includes the power to regulate and manage their domestic affairs, including marriage and divorce." (footnotes omitted)); 18 R.C.L. *Marriage* § 9 (1917) ("The rule as to Indian marriages is that so long as Indians live together under the tribal relation and tribal government, they are subject only to the jurisdiction of Congress. The civil laws of the state do not extend to them. They have been uniformly recognized as capable of regulating and managing their own tribal affairs, including their domestic relations; and domestic relations formed under their customs and laws have been treated by the courts as valid." (footnotes omitted)); 31 C.J. *Indians* § 25 n.30[b] (1923) ("A divorce, recognized by a tribe as valid under its customs and usages, will be recognized and treated as valid by the courts."); *see also* 38 C.J. *Marriage* § 4 (1925) ("The North American Indians continuing in their tribal relations, although within the territorial jurisdiction of a state, are

*See, e.g.*, 27A C.J.S. *Divorce* § 5 (2005) ("Indian tribal divorce is recognized by both federal and state governments, and the validity of such a divorce is generally determined in accordance with Indian tribal law." (footnotes omitted)); 27C C.J.S. *Divorce* § 1219 (2005) ("[I]t is the rule, under the principle that a divorce valid by the law where it is granted is recognized as valid everywhere, that the dissolution of an Indian marriage contract according to tribal laws and customs will be upheld, in the absence of a federal law invalidating such laws and customs." (footnotes omitted)); 42 C.J.S. *Indians* § 135 (2024) ("The authority of an Indian tribe to regulate the marital relationships of its members necessarily includes the authority of its tribal courts to adjudicate controversies involving those relationships, including divorce proceedings, when the tribe's law so provides.").

### E. Modern tribal courts continue to exercise jurisdiction over domestic affairs between Indians and non-Indians.

Today, tribal courts continue to exercise jurisdiction over domestic affairs, including those involving non-Indians, with the sanction of

---

not subject to its laws in respect of marriage . . . . The tribal jurisdiction does not depend on the particular boundaries of the reservation, but rather on the locus of the tribe as an entity . . . ." (footnotes omitted)).

26

federal and state courts. In *Turpen v. Turpen*, for instance, the Muckleshoot Tribal Court of Appeals held that its tribal court had jurisdiction over a divorce proceeding between a tribal member and a non-Indian. 2022 Muckleshoot App. LEXIS 3 (2022); *see also, e.g.*, *Yazzie v. Yazzie*, 1985 Navajo Sup. LEXIS 2 (1985) (holding that the tribal court had jurisdiction over a divorce between a member and non-member); *Jacobson v. Satiacum*, 1993 Puyallup Trib. LEXIS 1 (1993) (dissolving a marriage between Puyallup tribal member and non-member); *Chartier v. Chartier*, 2013 MI Odawa Tribal LEXIS 7 (2013) (recognizing tribal-court jurisdiction over divorce proceedings involving tribal member and nonmember).[12]

Certain federal courts have recognized modern tribal-court jurisdiction over domestic affairs involving non-Indians. In 1988, the Ninth Circuit held in *Sanders v. Robinson* that the Northern Cheyenne

---

[12] Tribal courts also exercise jurisdiction over other family-law matters involving tribal members and non-members, such as child custody. *See, e.g.*, *Dallas v. Curley*, 1996 Hopi App. LEXIS 3 (1996) (paternity and child custody dispute between Hopi tribal member and non-member); *In re Custody of R.W.O.E.*, 2001 ML 5088 (Crow Ct. App. 2001) (child-custody order between Crow tribal member and non-member); *In re D.L.M.*, 2005 Hoopa Valley App. LEXIS 5 (2005) (child-custody dispute between Hoopa tribal member and non-Indian).

27

Tribal Court had jurisdiction over a divorce between a member and a non-Indian. 864 F.2d 630, 631–34 (9th Cir. 1988). The district courts are largely in accord. *See, e.g.*, *Miodowski v. Miodowski*, 2006 WL 3454797 (D. Neb. Nov. 29, 2006); *Turpen v. Muckleshoot Tribal Ct.*, 2023 WL 4492250 (W.D. Wash. July 12, 2023). Federal courts have also recognized implicitly the validity of tribal-court adjudications of divorce in the cases that come before them. *See, e.g.*, *Tex. Life Ins. Co. v. Raper*, 2015 WL 5009805 (W.D. Okla. Aug. 24, 2015); *Rosser v. Rosser,* 2013 WL 372474 (W.D. Okla. Jan. 30, 2013).

State courts similarly continue to recognize the primacy of tribal jurisdiction over domestic relations. In one example, the Arizona Court of Appeals upheld Hopi jurisdiction over a divorce between a member and a non-Indian who were married off-reservation. *Leon v. Numkena*, 689 P.2d 566 (Ariz. Ct. App. 1984). The Hopi court also made a custody determination for the couple's four children, *id.* at 567–68, which the Arizona Court deemed "conclusive." *Id.* at 570. Similarly, the North Dakota Supreme Court recognized that tribal courts had concurrent jurisdiction with the state court to adjudicate a divorce between a member and non-Indian, as well as "the incidents of the parties'

28

marriage." *Kelly v. Kelly*, 759 N.W.2d 721, 722, 726 (N.D. 2009); *see also Byzewski v. Byzewski*, 429 N.W.2d 394, 400 (N.D. 1988) (holding that tribe had exclusive jurisdiction over a child-custody proceeding incident to divorce between a member and non-Indian). Like the lower federal courts, state courts, too, implicitly treat prior adjudications of divorce in tribal courts as legitimate. *See, e.g.*, *Langdeau v. Langdeau*, 751 N.W.2d 722, 729–31 (S.D. 2008) (implying the possibility of concurrent tribal-court jurisdiction); *Barrett v. Barrett*, 878 P.2d 1051 (Okla. 1994).

### III. The tribal court properly exercised jurisdiction over this family-law case.

At issue in this case is a dissolution of a marriage of a tribal citizen that will decide the distribution of tribal property and the privileges of tribal wealth following dissolution. As the Supreme Court has held, tribal governments "remain 'a separate people, with the power of regulating their internal and social relations,'" *Santa Clara Pueblo*, 436 U.S. at 55 (citation omitted). As a consequence, tribes retain the power to "determine tribal membership" and "regulate domestic relations among members." *Plains Com. Bank*, 554 U.S. at 327. Historically, the power to determine membership and regulate domestic relations included the power to regulate the provision of tribal rights and services

29

for non-Indians. This power over non-Indians is "ancillary" to the power of tribal governments over membership and domestic affairs. *Cooley*, 593 U.S. at 352.

Here, Appellant sought and enjoyed the rights and privileges of tribal wealth after marrying into the tribal community. Appellant has chosen to not work, Aplt.-App. 96; R. Doc. 30, at 2, and has instead derived her primary income during intermarriage from distributions of tribal wealth to community members in the form of per capita annual payments, often in excess of $170,000 per year. Aplt.-App. 78; R. Doc. 30, at 2. Appellant received and took advantage of health and dental benefits provided to her by the tribal government as a privilege of intermarriage into the community. Aplt.-App. 90; R. Doc. 30, at 14. Appellant enrolled the family's three children into the tribe to ensure that they benefited from distributions of tribal wealth also, including trust funds held by the tribal government that could amount to over a million dollars for each child at their age of majority, and tuition assistance for college. Aple.-App. 12. Distributions of tribal wealth to the family constituted most of the parties' income during their marriage. Aplt.-App. 96; R. Doc. 30, at 20.

The tribal court, applying tribal laws regarding intermarriage within the tribe and the limitations on privileges of intermarriage following dissolution, held that Appellant could no longer benefit individually from distributions of tribal wealth and resources following dissolution. Specifically, the tribal court held that Appellant would not receive a portion of tribal distributions of wealth for "spousal maintenance" from per capita payments that, pursuant to tribal law governing dissolution, the tribe would provide to Robert Tix and the children only. Aple.-App. 84; R. Doc. 17-1, at 81. The tribal court also held that Appellant could be removed from tribal-provided health and dental insurance policies. Aple.-App. 102; R. Doc. 17-1, at 99. Finally, the tribal court established certain parameters against efforts by Appellant to separate the children, who will continue to receive distributions of tribal wealth following dissolution, from their tribal community and heritage. Aple.-App. 65, 68–70; R. Doc. 17-1, at 62, 65–67.

Historically, the United States afforded tribal governments the authority to set the terms of marriage and divorce, in part to allow tribal law to determine who could benefit from the rights and privileges gained

31

by marriage and who could continue to benefit from those privileges following divorce. *See, e.g.*, An Act Regulating Intermarriages with White Men (1855), *supra*, at 105 (requiring that non-Indians be stripped of the privileges of citizenship following dissolution of the marriage). Affording tribal law the power to regulate "domestic affairs," including the ancillary power of regulating when non-Indians could join the community through marriage and benefit from tribal rights and privileges, allowed tribal governments to determine the boundaries of their communities and, ultimately, to protect tribal wealth, sovereignty, and self-government. *Cherokee Intermarriage Cases*, 203 U.S. at 82. Tribal law should similarly guide the distribution of tribal rights and privileges at issue in this case.

## CONCLUSION

The judgment of the district court should be affirmed.

Appellate Case: 24-3487     Page: 39     Date Filed: 04/11/2025 Entry ID: 5505516

Date: April 9, 2025

Respectfully submitted,

*/s/* Steven J. Alagna

Steven J.  Alagna
*Counsel of Record*

Kyle Lorey
Kaitlyn Salyer
Olivia Guidry
*Student Advocates*

WASHINGTON UNIVERSITY
SCHOOL OF LAW
Appellate Clinic
One Brookings Drive
MSC 1120-250-102
St. Louis, MO 63130
(314) 935-7238
salagna@wustl.edu

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

1.  I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(a)(5).  This brief contains 6,495 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Rule 32(f).

2.  In addition, this brief complies with the typeface and type-style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook font.

/s/ Steven J.  Alagna

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2025, I electronically filed the original version of this brief, using the Court's CM/ECF system, which served all counsel of record.  I certify that on April 11, 2025, I electronically filed this corrected brief using the Court's CM/ECF system, which will serve all counsel of record.

/s/ Steven J.  Alagna

34